**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| C-SUITE IMPACT,<br><br>     Plaintiff,<br><br>  v.<br><br>TREEHOUSE TECHNOLOGY<br>GROUP, PHILIP WESS, DARTON<br>ROSE, and CHADWICK ROSE,<br><br>     Defendant. | **\*Jury Trial Demanded\*** |

## **COMPLAINT**

Plaintiff, C-Suite IMPACT ("CSI"), by and through its attorneys, hereby submits the following Complaint against Defendants Treehouse Group Technologies ("TTG"), Philip Wess, Darton Rose, Chadwick Rose (collectively referred to as the "Individual Defendants," and together with TTG, "Defendants").

## **INTRODUCTION AND SUMMARY OF CLAIMS**

1. On or about September 7, 2023, CSI and TTG entered into an engagement agreement (the "Agreement")[1] pursuant to which TTG engaged CSI to provide financial advisory services in connection with TTG's efforts to complete a sale, merger, or acquisition involving TTG; and in return, TTG agreed to pay CSI a fee ("Success Fee") upon the successful consummation of a Transaction resulting from CSI's Services.

2. Specifically, TTG engaged CSI to act as TTG's financial advisor in facilitating a Transaction on TTG's behalf, including assisting TTG with identifying and evaluating potential

---

[1] All capitalized terms used but not defined herein shall have the meanings assigned to them in the Agreement.

third parties who wished to acquire TTG. Upon the closing of any such Transaction with a Referred Party, TTG agreed to pay CSI a Success Fee equal to a specified percentage of the Transaction value, which the agreement provides will be 10% of the Transaction value of $2,000,000 and 6% where the Transaction value exceeded $2,000,000. To protect CSI's right to fair compensation for its Services, the Agreement specified that CSI was entitled to the Success Fee if TTG closed a transaction within twelve months from executing the agreement (the "Term Period") or within twelve months immediately following the Term Period (the "Tail Period").

3.      In accordance with its obligations under the Agreement, CSI provided Services to TTG beginning in November 2023 and continuing through late March 2024. As part of the Services it provided to TTG, CSI introduced several third parties to TTG as potential acquirers of the Company. Wolf and Company, P.C. ("Wolf") was one of the potential acquirers that CSI introduced to TTG was.

4.      On March 27, 2024, after TTG had moved a deal process far along with Wolf, TTG sent CSI written notice that it was terminating the Agreement.

5.      Just a few weeks later, on or around May 5, 2024 and within the Agreement's twelve-month Term Period—TTG consummated a transaction with Wolf as contemplated by the agreement with CSI (the "TTG-Wolf Transaction").

6.      Despite CSI's fulfillment of its contractual obligations and provision of extensive services to TTG from November 2023 through late March 2024, TTG has refused to pay CSI the Success Fee owed in connection with the TTG-Wolf Transaction.  TTG and the Individual Defendants also unjustly enriched themselves by accepting and/or diverting proceeds from the Transaction that should have been used to compensate CSI for the substantial work it delivered to TTG over the course of the parties' relationship and resulted in the TTG-Wolf Transaction.

7.      Based on this and other conduct, CSI brings this action for relief as described in more detail below.

## PARTIES

8.      CSI is a domestic profit corporation organized under the laws of the State of New Jersey, with a principal place of business in Morganville, New Jersey.

9.      Prior to the Transaction, TTG was a Massachusetts limited liability company with a principal place of business in Marlborough, Massachusetts. Upon information and belief, following the Transaction TTG continues to be located in Marlborough, Massachusetts and is an operating subsidiary of Wolf and Company, P.C., which is a Massachusetts professional corporation with its principal place of business in Boston, Massachusetts.

10.     Philip Wess is the former Chief Executive Officer of TTG and is currently employed as a Principal at Wolf and Company, P.C. As a result, Philip Wess transacts business within the Commonwealth of Massachusetts. Upon information and belief, Philip Wess is a Massachusetts resident.

11.     Darton Rose is the former President of TTG and is currently employed as a Principal at Wolf and Company, P.C. As a result, Darton Rose transacts business within the Commonwealth of Massachusetts. Upon information and belief, Darton Rose is a resident of Newfields, New Hampshire.

12.     Chadwick Rose is the former Managing Partner of TTG and is currently employed as a Principal at Wolf and Company, P.C. As a result, Chadwick Rose transacts business within the Commonwealth of Massachusetts. Upon information and belief, Chadwick Rose is a resident of Austin, Texas.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states and the amount in controversy is over $75,000.

14.     This Court has personal jurisdiction over TTG because it expressly consented to the jurisdiction of federal courts in Massachusetts in the forum selection clause of the Agreement at issue in this lawsuit. Section 17 of the Agreement states in part:

> "Each party hereby irrevocably agrees that any suit or other legal proceeding arising out of or relating to this Engagement Agreement may be brought only in a court in the Commonwealth Of Massachusetts or in the United States District Court located in Massachusetts. This engagement Agreement shall be governed by the laws of the Commonwealth of Massachusetts, without regard to such state's rules concerning conflict of laws."

15.     This Court has personal jurisdiction over Defendant Philip Wess as he is a resident of Massachusetts.

16.     This Court has personal jurisdiction over each of the Individual Defendants because at all times referenced herein each was a founder, principal, manager, board member, owner, operator, administrator and/or partner of Massachusetts-based Defendant TTG thereby maintaining continuous, systematic, and substantial contacts with Massachusetts.  Each of the Individual Defendants continuously transacted business within Massachusetts by and through their affiliation with and operation of TTG by and through which they have each purposefully availed themselves to the privileges and protections afforded by the Commonwealth of Massachusetts. Such conduct carried out within this Massachusetts includes without limitation their actions giving rise to CSI's claims asserted herein.

17.     Venue is proper in this District for TTG under 28 U.S.C. § 1391 and because TTG agreed in the forum selection clause in the Agreement at issue that venue would be proper in this Court.

18.     Venue is proper in this District for Philip Wess, Darton Rose, and Chadwick Rose under 28 U.S.C. § 1391 (b)(1) and (2) because they each either reside in or transact business within the Commonwealth of Massachusetts, which is the district in which a substantial part of the events giving rise to the claims herein occurred.

## FACTUAL ALLEGATIONS

### A.  TTG Retains CSI

19.     In or about September 2023, TTG was looking for assistance in connection with its exploration of strategic alternatives including a possible sale, merger, or acquisition with a third party and a financial advisor and investment banker to consult with and advise TTG with respect to a potential transaction.

20.     On or around September 7, 2023, the parties executed an engagement agreement (the "Agreement") whereby TTG engaged CSI to serve as its "financial advisor" and "investment banker to consult and advise" TTG with respect to any sale, merger, or acquisition (referred to as a "Transaction"). *See* Agreement attached hereto as **Exhibit A**, pg. 1.

### B.  The Agreement Between TTG and CSI

21.     Under the Agreement, TTG and CSI agreed that CSI would provide a number of advisory services to TTG in connection with a potential Transaction (CSI's "Services"). Those Services included, without limitation:

    a.  reviewing TTG's financial condition, operations, competitive environment, prospects and related matters for potential investors;

    b.  preparing the information package or confidential information memorandum in conjunction with TTG;

    c.  soliciting, coordinating and evaluating indications of interest and proposals regarding a Transaction;

    d.  advising TTG as to the structure of a Transaction; and

5

237beff411e94752

e.  providing such other financial advisory and investment banking services reasonably necessary to accomplish the foregoing.

*Id.*, pgs. 1-2.

22.     The Agreement defines "Transaction" broadly to include "[1] any sale, transfer or conveyance of substantially all of the assets or ownership of Company, a Subsidiary of Company, or any division of either, [2] any purchase of a business or any division thereof, and [3] any merger, consolidation, strategic alliance, joint venture or other similar transaction involving Company or any Subsidiary." *Id.*, pg. 3.

23.     In exchange for the Services, TTG agreed to pay CSI a Success Fee to be paid if and when TTG consummated a deal.

24.     Specifically, upon the closing of a Transaction as defined by the Agreement, TTG was required to pay CSI a Success Fee equaling "10.0% of the Consideration in a Transaction for the first $2,000,000" and "6% of the Consideration for amounts over $2,000,000." *Id.*, pg. 2.

25.     Pursuant to the Agreement, TTG's engagement of CSI would continue for a twelve-month Term Period. Either party could terminate the Agreement upon 30 days' written notice during the Term Period.

26.     The Agreement also included a Tail Period of twelve months immediately following the Term Period, during which TTG remained obligated to pay CSI the Success Fee if TTG closed a transaction with a "Referred Party" as contemplated by the Agreement, or a third party who was on CSI's "Existing Contact List."

27.     TTG never included Wolf on the "Non-Referred Party List" under the Agreement, which excludes CSI from a Success Fee if a Transaction is consummated with a Non-Referred Party. *Id.*, pg. 3 and Exhibit B to the Agreement.

C. **CSI's Performance Under the Agreement**

28.     CSI began working immediately after the Agreement was executed and introduced several third parties to TTG as potential acquirers of the Company.

29.     On or around November 16, 2023, CSI met with the Chief Executive Officer ("CEO") of Wolf through CSI's relationship and contacts with Whitman Transition Advisors, and for the first time raised with Wolf's CEO the prospect of a potential TTG-Wolf Transaction.

30.     Immediately following that meeting, CSI and Wolf entered into a Mutual Confidentiality and Non-disclosure Agreement ("NDA") to allow Wolf to receive confidential information concerning TTG in order to evaluate and discuss a potential transaction. The NDA between CSI and Wolf was fully executed on November 17, 2023.

31.     CSI's efforts directly resulted in TTG and the Individual Defendants being introduced to Wolf as a potential acquirer of the TTG.  This specifically included the introduction to Wolf's CEO and key decisionmakers who had not previously known TTG or any of the Individual Defendants. CSI made the initial introduction of Wolf's CEO to Defendant Wess  by email on November 17, 2023.

32.     By and through these efforts, Wolf was introduced by CSI to TTG as a potential acquirer, making Wolf a Referred Party under the Agreement for the next four months.

33.     After the initial introduction, CSI continued to take the lead on all direct communications with Wolf regarding a potential Transaction.

34.     Between November 17 and 21, 2023, CSI continued its efforts on behalf of TTG by sending Wolf information concerning TTG including without limitation, overview materials regarding TTG's primary solution InsightOut, customer success stories, and a presentation regarding TTG's focus on "Growth Opportunities for the Buyer."

35.   Less than a week later, on or around November 27, 2023, CSI followed up with Wolf to organize an in-person meeting among CSI, TTG, and Wolf representatives to discuss a potential Transaction.

36.   On December 7, 2023, CSI orchestrated an in-person meeting in Boston, Massachusetts among CSI, TTG (including all of the Individual Defendants), and Wolf representatives, which was the first meeting between all three companies in connection with assessing a potential Transaction. In advance of the meeting, CSI provided TTG with an outline of topics to cover and prepared the TTG principals for the meeting.

37.   For the next three months, CSI continued advancing the potential TTG-Wolf Transaction by (i) advising TTG on the M&A process; (ii) modeling potential deal frameworks and synergies; and (iii) facilitating discussions between TTG and Wolf, including multiple in-person meetings among CSI, TTG, and Wolf.

38.   During this time frame, it became more and more likely that a TTG-Wolf Transaction would be consummated.

39.   On February 29, 2024, CSI had an in-person meeting with Wolf to discuss potential framework for a TTG-Wolf Transaction.

40.   CSI then spent that following weekend, March 1, 2024 through March 3, 2024 building deal models and interfacing with Wolf regarding the same.

41.   Throughout the first full week of March 2024, CSI continued working with Wolf on the final parameters concerning 401k plans, pensions, salaries and benefits, as well as other financial information in advance of circulating a finalized merger overview and pre-opening valuation.

42. On or around March 6, 2024, CSI circulated the merger overview to Wolf, along with the pre-opening valuation.

43. Following that transmittal, CSI engaged in communications with Wolf regarding a potential Transaction including, but not limited to, Wolf's counterproposal. CSI also coordinated additional meetings related to a potential Transaction between TTG and Wolf.

44. On March 27, 2024, with the TTG-Wolf Transaction all but finalized, TTG sent a notice of termination to CSI, which was effective 30 days after such notice.

45. On the same date, CSI responded to the transmittal email for the TTG's termination notice, confirming receipt and expressly reminding TTG that "[a]ny introduction including Wolf is part of our agreement and [TTG] will be responsible for the terms of the agreement."

46. Prior to TTG's termination of the Agreement, TTG and the Individual Defendants knew of and assented to CSI's continued performance under the Agreement.

47. At no time during the parties' relationship did TTG or any of the Individual Defendants ever claim that Wolf was not a Referred Party under the Agreement. Had any Defendant done so, CSI would not have remained incentivized to devote the significant amount of time, resources, and energy it allocated to pursuing a potential Transaction with Wolf.

48. The TTG-Wolf Transaction closed on or around May 5, 2024, less than 40 days after TTG terminated the Agreement. TTG concealed this fact from CSI, despite CSI requesting information from TTG about the TTG-Wolf Transaction.

**D.** **TTG's Refusal to Pay CSI the Success Fee**

49. CSI satisfied all of its contractual obligations under the Agreement by providing Services to TTG and TTG knowingly accepted those Services.

50.     Upon information and belief, Defendants TTG, Philip Wess, Darton Rose and Chadwick Rose received and/or diverted sale proceeds at closing of the Transaction, which should have been used to pay CSI's Success Fee.

51.     After discovering that the TTG-Wolf Transaction closed, CSI demanded payment from TTG for the Success Fee owed pursuant to the Agreement.

52.     Despite accepting the benefits of CSI's Services, TTG refused and continues to refuse to pay CSI its Success Fee in breach of its obligations under the Agreement.

53.     One of TTG's advisors, who was the referral source that initially connected CSI with TTG, captured things best when he wrote to CSI that TTG's refusal to pay CSI under the terms of the Agreement was "***unbelievable***" and "***just wrong***."

54.     As a direct result of TTG's breach of contract and the Individual Defendants' related conduct, CSI has received no compensation for the extensive Services it provided to TTG from November 2023 through March 2024 under the Agreement.

## COUNT I
## Breach of Contract (against TTG)

55.     CSI realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth fully herein.

56.     CSI and TTG are parties to the Agreement, which was a valid and enforceable contract as of September 7, 2023.

57.     As described above, CSI fully performed its obligations under the Agreement.

58.     CSI fulfilled all conditions precedent required by the Agreement.

59.     TTG consummated a Transaction with Wolf within the twelve-month Tail Period covered by the Agreement.

60.     TTG breached the terms of the Agreement by failing to pay CSI the Success Fee.

61.     As a direct and proximate result of TTG's breach of contract, CSI has incurred monetary damages in an amount to be determined at trial.

## COUNT II
### Breach of Implied Covenant of Good Faith and Fair Dealing (against TTG)

62.     CSI realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth fully herein.

63.     The Agreement contains an implied covenant of good faith and fair dealing, which Defendants breached.

64.     The Agreement was made for valid consideration.

65.     CSI agreed to provide Services to TTG for the Success Fee as set forth in the Agreement.

66.     CSI reasonably expected to be compensated for the months of work that resulted in the closing of the TTG-Wolf Transaction.

67.     TTG breached the implied covenant of good faith and fair dealing by, *inter alia*, refusing to pay CSI the Success Fee, which has no basis in contract.

68.     As a direct and proximate result of the foregoing, CSI has suffered, and will continue to suffer, damages in an amount to be determined at trial.

## COUNT III
### Unjust Enrichment (against all Defendants)

69.     CSI realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth fully herein.

70.     Defendants received a benefit from CSI through the successful facilitation and closing of the TTG-Wolf Transaction.

71.     As described above, Defendants had knowledge of and appreciated the benefit conferred upon it from CSI.

72.     Defendants accepted the benefits from CSI, without paying CSI the Success Fee as required by the Agreement.

73.     Defendants continue to retain the Success Fee amounts and have been unjustly enriched by continuing to retain these amounts that belong to CSI pursuant to the Agreement.

74.     Defendants' refusal to pay CSI the Success Fee make their acceptance of the benefits provided by CSI inequitable.

75.     As a direct and proximate result of the foregoing, CSI has suffered, and will continue to suffer, damages in an amount to be determined at trial.

**COUNT IV**
**Quantum Meruit (against TTG)**

76.     CSI realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth fully herein.

77.     As described in detail above, CSI conferred a measurable benefit upon TTG, which lead to the closing of the TTG-Wolf Transaction.

78.     TTG accepted the Services and benefits provided by CSI.

79.     CSI reasonably expected to be compensated by TTG in the amount of the Success Fee, which will be determined at trial.

80.     TTG had knowledge, actual and chargeable, that CSI reasonably expected to be compensated for the closing of the TTG-Wolf Transaction.

81.     As a result of TTG's above-described actions, CSI has suffered, and will continue to suffer, damages in an amount to be determined at trial.

## COUNT V
## <u>Violation of M.G.L. c. 93A, Section 11 (against All Defendants)</u>

82.     CSI realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth fully herein.

83.     CSI started working to cultivate the TTG-Wolf Transaction as early as November 2023 when CSI introduced Wolf to TTG as a potential acquirer of TTG.

84.     CSI worked with both TTG and Wolf over the next few months to develop and facilitate the TTG-Wolf Transaction.

85.     Once all the leg work for the TTG-Wolf Transaction was substantially completed, TTG abruptly terminated the Agreement with CSI.

86.     Upon information and belief, Defendants never intended to pay CSI for facilitating the TTG-Wolf Transaction, which is evident by TTG's refusal to pay CSI a retainer fee and ultimately TTG's refusal to pay CSI the Success Fee. Rather, TTG intended to use CSI's resources and expertise to their own benefit without compensating CSI.

87.     Defendants knew that CSI was continuing to perform Services under the Agreement, and Defendants willingly accepted those Services under the Agreement, despite not intending to pay CSI for such Services.

88.     Defendants took advantage of and benefitted from CSI's close connections to Wolf's leadership—i.e., Wolf's CEO—which ultimately resulted in the TTG-Wolf Transaction.

89.     After CSI provided its Services that resulted in the TTG-Wolf Transaction, Defendants jettisoned CSI from the deal process and the TTG-Wolf Transaction closed just weeks later.

90.     After the TTG-Wolf Transaction closed, Defendants wrongfully refused to pay CSI the Success Fee due in connection with the TTG-Wolf Transaction and has concealed from CSI the final terms of consummated deal.

91.     Defendants' deceptive business practices have harmed CSI.

92.     Defendants' foregoing acts, pattern, and practices constitute unfair competition and unfair and deceptive acts and practices under G.L. c. 93A.

93.     Defendants' acts, pattern, and practices are willful and knowing, as Defendants knew or should have known that their acts, pattern, and practices were in violation of G.L. c. 93A, which is designed to protect against unfair and deceptive acts or practices.

94.     Defendants' acts and practices occurred primarily and substantially within the Commonwealth of Massachusetts.

95.     Defendants' acts and practices in violation of G.L. c. 93A have damaged, and continue to damage, CSI.

## **JURY DEMAND**

CSI hereby requests a jury on all claims triable by jury.

**WHEREFORE**, CSI prays that this Honorable Court award:

A.     CSI's monetary damages or restitution resulting from Defendants' conduct in the amount to be proven at trial including punitive damages;

B.     Pre-judgment and post-judgment interest as allowed under statutory and common law;

C.     CSI's attorneys' fees, costs, and expenses of litigation pursuant to Section 17 of the Agreement; and

D.     Other and further relief as the Court deems just.

C-SUITE IMPACT

By its attorneys,

*/s/ Michael T. Jones*

Michael T. Jones (BBO # 696052)
Ian Epperson-Temple (BBO # 699463)
HOLLAND & KNIGHT LLP
10 St. James Ave – 11th Floor
Boston, MA 02116
Dated: October 17, 2024.    Telephone: (617) 523-2700