UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| C-SUITE IMPACT,<br><br>    Plaintiff,<br><br>v.<br><br>TREEHOUSE TECHNOLOGY GROUP,<br>PHILIP WESS, DARTON ROSE, and<br>CHADWICK ROSE,<br><br>    Defendants. | No. 1:24-cv-12640-JEK |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

In this breach of contract action, plaintiff C-Suite IMPACT alleges that defendant Treehouse Technology Group refused to pay C-Suite a fee in accordance with the terms of the parties' contract. Under the contract, C-Suite alleges, it served as a financial advisor to Treehouse in connection with a financial transaction between Treehouse and non-party Wolf and Company, P.C. C-Suite claims that Treehouse has impermissibly withheld the fee C-Suite earned for its work to facilitate that transaction. C-Suite also brings claims against Philip Wess, former Chief Executive Officer ("CEO") of Treehouse; Darton Rose, former President of Treehouse; and Chadwick Rose, former Managing Partner of Treehouse.

The defendants move to dismiss the complaint. They contend that the contract is unenforceable under Massachusetts law, because C-Suite acted as a broker-dealer in providing financial advice to Treehouse pursuant to the contract, but was not, at the time, registered with the Commonwealth as a broker-dealer. The defendants also contend that C-Suite's unjust enrichment and quantum meruit claims are foreclosed by its other claims, and that its claim under M.G.L. c. 93A must be dismissed for failure to state a claim. For the reasons that follow, the motion will

be granted in part and denied in part. Neither the contract nor the allegations in the complaint compel the conclusion that C-Suite was required to register as a broker-dealer, and the Court will not, accordingly, dismiss C-Suite's claims on the basis that the contract was unenforceable. C-Suite's allegations also adequately state a chapter 93A claim, but because C-Suite's breach of contract and chapter 93A claims afford it an adequate remedy at law, its unjust enrichment and quantum meruit claims will be dismissed.

## BACKGROUND

The Court recounts the facts based on the allegations in the complaint and "the content of documents . . . sufficiently referenced in the complaint." *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 15 (1st Cir. 2024).

### I.      The Engagement Agreement.

On September 7, 2023, C-Suite and Treehouse entered into an Engagement Agreement, pursuant to which C-Suite agreed to act as Treehouse's "financial advisor" and "investment banker to consult with and advise" Treehouse on a possible transaction. ECF 1, ¶ 20; ECF 1-1, at 1 & ¶ 2. The Agreement defined a "Transaction" as "any sale, transfer or conveyance of substantially all of the assets or ownership of [Treehouse], a [Treehouse subsidiary], or any division of either"; "any purchase of a business or any division thereof"; and "any merger, consolidation, strategic alliance, joint venture or other similar transaction involving [Treehouse] or any [s]ubsidiary." ECF 1, ¶ 22; ECF 1-1, ¶ 3(b).

Under the Agreement, C-Suite agreed to provide Treehouse the following services: (1) "reviewing [Treehouse's] financial condition, operations, competitive environment, prospects and related matters for potential investors"; (2) preparing the information package or confidential information memorandum in conjunction with [Treehouse]"; (3) "soliciting, coordinating and

evaluating indications of interest and proposals regarding a Transaction"; (4) "advising [Treehouse] as to the structure of a Transaction"; and (5) "providing such other financial advisory and investment banking services reasonably necessary to accomplish the foregoing." ECF 1, ¶ 21; ECF 1-1, ¶ 2. In exchange for these services, Treehouse agreed to pay C-Suite a "Success Fee" if Treehouse closed a Transaction, subject to certain conditions. ECF 1, ¶ 23. For Transactions executed with a "Referred Party," the Success Fee would be 10% of the consideration in the Transaction for the first $2,000,000, and 6% of the consideration for amounts exceeding $2,000,000. *Id.* ¶ 24; ECF 1-1, ¶¶ 3(a)(i)(1), 5. A "Referred Party" was any entity or person "introduced by" C-Suite to Treehouse "as a potential acquirer" of Treehouse or any of its subsidiaries in a Transaction. ECF 1-1, ¶ 5. C-Suite would earn a Success Fee calculated at a lower percentage if Treehouse closed a Transaction with a company on Treehouse's existing contact list, and no fee would be due if Treehouse consummated a deal with a company on its non-referred party list. *Id.* ¶¶ 3(a)(i)(2), 3(c).

The Agreement stated that the Success Fee would be "due and payable immediately upon the closing of the Transaction," and that upon the consummation of any Transaction in which C-Suite was owed a Success Fee, Treehouse would provide C-Suite with "a copy of the Transaction document and a statement setting forth in detail the basis on which the Success Fee is calculated." *Id.* ¶ 3(c). The "Term" of the Agreement was to last for twelve months, unless terminated upon thirty days' advance notice. ECF 1, ¶ 25; ECF 1-1, ¶ 5. The twelve months following the Term was designated as the "Tail Period." ECF 1, ¶ 26; ECF 1-1, ¶ 5. Treehouse agreed that if it entered into or consummated a Transaction with a Referred Party or a third party on Treehouse's existing contact list during either the Term or Tail Period, it would pay C-Suite a Success Fee. ECF 1, ¶ 26; ECF 1-1, ¶ 5.

II.     **The Parties' Performance Under the Agreement.**

On November 16, 2023, C-Suite met with the CEO of Wolf and pitched the idea of a transaction between Treehouse and Wolf. ECF 1, ¶ 29. The next day, C-Suite and Wolf entered into a Mutual Confidentiality and Non-Disclosure Agreement to share information with Wolf regarding a potential deal, and C-Suite introduced Treehouse CEO Philip Wess to Wolf's CEO by email. *Id.* ¶¶ 30-31.

Over the next four days, C-Suite sent Wolf more information about Treehouse, including "overview materials regarding [Treehouse's] primary solution InsightOut, customer success stories, and a presentation regarding [Treehouse's] focus on 'Growth Opportunities for the Buyer.'" *Id.* ¶ 34. C-Suite also arranged a December 7, 2023 in-person meeting among C-Suite, Treehouse, and Wolf representatives in Boston. *Id.* ¶¶ 35-36. For this meeting, C-Suite provided Treehouse with an outline of topics and prepared the Treehouse principals. *Id.* ¶ 36. During the three months following the meeting, C-Suite continued to advise Treehouse on the merger and acquisition process, modeled potential deal frameworks, and facilitated discussions and in-person meetings between Treehouse and Wolf. *Id.* ¶ 37.

On February 29, 2024, C-Suite met with Wolf to discuss a potential framework for the transaction between Treehouse and Wolf, and then spent the following weekend building deal models and discussing them with Wolf. *Id.* ¶¶ 39-40. Through the first week of March 2024, C-Suite worked with Wolf on the "final parameters" of the deal, including the "401k plans, pensions, salaries and benefits, as well as other financial information in advance of circulating a finalized merger overview and pre-opening valuation." *Id.* ¶ 41. C-Suite circulated the merger overview and pre-opening valuation to Wolf on March 6, 2024, and communicated with Wolf regarding its counterproposal. *Id.* ¶¶ 42-43. This work was done with Treehouse's knowledge and

consent, and at no time did Treehouse claim that Wolf was not a Referred Party under the Agreement between Treehouse and C-Suite. *Id.* ¶¶ 46-47; *see* ECF 1-1, Exhibit A, at 10-12 (Wolf not included on existing contact list); ECF 1-1, Exhibit B, at 13 (Wolf not included on non-referred party list).

On March 27, 2024, Treehouse sent a notice of termination to C-Suite. ECF 1, ¶ 44. At this point, the deal between Treehouse and Wolf was all but finalized. *Id.* In response to the termination notice, C-Suite confirmed receipt and reminded Treehouse that Wolf was a Referred Party under the Agreement. *Id.* ¶ 45.

Treehouse and Wolf consummated a deal on May 5, 2024, just over 30 days after Treehouse sent C-Suite the notice of termination. *Id.* ¶ 48. Treehouse concealed this fact from C-Suite, despite C-Suite's requests for information about the transaction. *Id.* When C-Suite discovered that the deal had been completed, it demanded payment of its success fee pursuant to the Agreement. *Id.* ¶ 51. To date, Treehouse refuses to pay C-Suite any compensation for its services in connection with the transaction. *Id.* ¶¶ 52, 54. C-Suite alleges that even though Treehouse and the individual defendants knew that C-Suite was performing services under the Agreement, they never intended to pay C-Suite for its work to facilitate the deal between Treehouse and Wolf. *Id.* ¶¶ 46, 86-87.

### III.     Procedural History.

Invoking this Court's diversity jurisdiction, C-Suite filed this suit against Treehouse and the individual defendants on October 17, 2024. *Id.* ¶ 13. C-Suite asserts five claims: breach of contract against Treehouse (Count I); breach of the implied covenant of good faith and fair dealing against Treehouse (Count II); unjust enrichment against all the defendants (Count III); quantum meruit against Treehouse (Count IV); and a violation of M.G.L. c. 93A, § 11 against all the defendants (Count V). *Id.* ¶¶ 55-95. The defendants moved to dismiss the complaint in November

2024. ECF 5. After receiving C-Suite's opposition and holding a hearing, the Court took the motion under advisement. ECF 9, 15.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "'whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted.'" *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court "may properly consider only facts and documents that are part of or incorporated into the complaint." *Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (quotation marks omitted).

## DISCUSSION

**I.     Enforceability of the Agreement.**

Treehouse first contends that C-Suite's claims must be dismissed because the Agreement is unenforceable under Massachusetts law.[1] In Treehouse's view, the Agreement is unenforceable

---

[1] When, as here, subject matter jurisdiction is premised on diversity of citizenship, federal courts apply state substantive law to the parties' claims. *Shay v. Walters*, 702 F.3d 76, 79 (1st Cir. 2012). Generally, "[i]n determining what state law pertains, the court must employ the choice-of-law framework of the forum state," which here is Massachusetts. *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir. 1994). But where "'the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent choice of law analysis and accept the parties' agreement.'" *Shay*, 702 F.3d at 80 (brackets omitted)

because it called for services that in Massachusetts require "broker-dealer" registration and because C-Suite acted as a broker-dealer in the performance of the Agreement, even though it was not registered as a broker-dealer with the Commonwealth. Relying on two key Massachusetts decisions—*NTV Management, Inc. v. Lightship Global Ventures*, 484 Mass. 235 (2020), and *Indus Partners, LLC v. Intelligroup, Inc.*, 77 Mass. App. Ct. 793 (2010)—Treehouse maintains that C-Suite's failure to register as a broker-dealer renders the Agreement unenforceable.

The Massachusetts Uniform Securities Act provides that no person may "transact business in [Massachusetts] as a broker-dealer or agent unless he is registered under this chapter." M.G.L. c. 110A, § 201(a). Failure to register as a broker-dealer, where such registration is required, renders a contract performed in the course of such conduct unenforceable. *See id.* § 410(f); *NTV Mgmt.*, 484 Mass. at 238. Specifically, the Act states that "[n]o person who has made or engaged in the performance of any contract in violation of [chapter 110A] . . . may base any suit on the contract." M.G.L. c. 110A, § 410(f). Thus, where a contract is "made" in such a way as to require a party to act as a broker-dealer, or where that party acts as a broker-dealer in "the performance of [the] contract," *id.*, the party's failure to register as a broker-dealer prevents it from seeking relief for a breach of that contract, *NTV Mgmt.*, 484 Mass. at 238.

The Act defines a "broker-dealer" as "any person engaged in the business of effecting transactions in securities for the account of others or for his own account." M.G.L. c. 110A, § 401(c). To determine if a contract "on its face" is an agreement that requires broker-dealer registration, the Supreme Judicial Court ("SJC") has instructed, a court must consider "(1) whether

---

(quoting *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991)). Here, the parties specified in the Agreement that Massachusetts law governs disputes concerning the Agreement, *see* ECF 1-1, ¶ 17, and they have cited exclusively to Massachusetts law in their briefing, *see generally* ECF 6, 9. The Court will accept the parties' agreement that Massachusetts law governs this dispute and apply Massachusetts substantive law. *See Shay*, 702 F.3d at 80.

7

the contract requires that the transactions 'effected' be in 'securities'; and (2) whether the contract requires a person to 'effect' such transactions." *NTV Mgmt.*, 484 Mass. at 241-42 (quoting M.G.L. c. 110A, § 401(c)). Or, "[p]ut differently," a court must consider "(1) whether the instrument that is the subject of the transaction is a 'security,' and, if so, (2) whether the conduct required by the contract amounts to 'effecting transactions.'" *Id.* at 242 (quoting M.G.L. c. 110A, § 401(c)).

> Under Massachusetts law, "unless the context otherwise requires," a "security" includes:
>
> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

M.G.L. c. 110, § 401(k). While this definition of "security," like the analogous federal definition,[2] is broad, the determination of whether an instrument is a security requires a "nuanced inquiry, one that is context dependent." *NTV Mgmt.*, 484 Mass. at 243.

The leading case in this arena is *NTV Management*. In that case, the plaintiff agreed to provide financial advice to the defendant regarding its acquisition of a third-party business. *Id.* at 236-37. The parties' relationship deteriorated, and the defendant terminated the parties' contract before eventually completing the acquisition. *Id.* at 237. After the jury returned a verdict in favor of the plaintiff on its breach of contract claim, the trial court ruled, on the defendant's motion, that the plaintiff's failure to register as a broker-dealer required setting aside the verdict. *Id.* at 238-39. On appeal, the SJC considered whether, on its face, the contract at issue required transactions

---

[2] *See* 15 U.S.C. § 78c(a)(10); M.G.L. c. 110A, § 415 (instructing courts to construe chapter 110A—including the definition of a "security"—"to coordinate the interpretation and administration of [the] chapter with the related federal regulation").

involving securities. *Id.* at 244-48. The contract required the plaintiff to "source capital and structure financing transactions" in connection with the defendant's acquisition of the third party, including by "introduc[ing] and facilitat[ing] investment from third party sources collectively able to finance all levels of the transactions (i.e., both equity and debt)." *Id.* at 236-37, 245. Concluding that the contract failed to "definitively state the nature of the financing transactions" and, to the contrary, "impl[ied] that different forms of financing would be possible," the SJC ruled that the contract did not, by its terms, require a transaction in securities. *Id.* at 245-46, 248. The SJC therefore vacated the lower court's order setting aside the jury verdict. *Id.* at 248.

The SJC did not consider the separate question of whether the plaintiff's "performance of [the] contract" required it to register as a broker-dealer, M.G.L. c. 110A, § 410(f), because the parties had stipulated that the trial court should resolve the defendant's motion based "solely on the language of the contract," *NTV Mgmt.*, 484 Mass. at 242 n.15. Thus, the SJC did not consider evidence concerning "the economic realities" of the relevant financing transactions. *Id.* at 244-45. But the SJC nevertheless cautioned that "whether a 'transaction in securities' has taken place rarely is resolved . . . solely on the face of a contract," because evidence of actual performance can likewise affect whether state law requires registration as a broker-dealer. *Id.* at 246 n.20; *see id.* at 247 (distinguishing *Indus Partners*, where, on the face of the contract, "it was undisputed that the contract required a transaction in securities," and, therefore, the only issue before the court was "whether the services described in the contract required the plaintiff to 'effect transactions'" (citing *Indus Partners*, 77 Mass. App. Ct. at 793 n.1, 798-99)).

Here, as in *NTV Management*, the Agreement between C-Suite and Treehouse does not on its face "identify a specific type of instrument . . . that would be used to facilitate the sought-after" transaction. *Id.* at 245. To the contrary, it contemplates a broad array of possible transactions that

9

may or may not involve a transaction in securities. *See* ECF 1-1, ¶ 3(b) (defining a "Transaction" as "any sale, transfer or conveyance of substantially all of the assets or ownership of [Treehouse], a [Treehouse subsidiary], or any division of either"; "any purchase of a business or any division thereof"; and "any merger, consolidation, strategic alliance, joint venture or other similar transaction involving [Treehouse] or any [s]ubsidiary"). Accordingly, Treehouse has not demonstrated, as a matter of law, that the Agreement "requires that the transactions 'effected' be in 'securities,'" and it therefore has not established that C-Suite was obligated to register as a broker-dealer based on the language of the Agreement. *NTV Mgmt.*, 484 Mass. at 241-42.

Nor do the allegations in the complaint, or any document incorporated therein, establish as a matter of law that C-Suite's performance under the Agreement required broker-dealer registration. The complaint describes C-Suite's outreach to Wolf on behalf of Treehouse, C-Suite's facilitation of meetings between Treehouse and Wolf on a potential transaction, and C-Suite's efforts to model deal frameworks between Treehouse and Wolf. *See* ECF 1, ¶¶ 29-44. But the complaint does not contain allegations about the structure of the framework that C-Suite proposed for Treehouse's transaction with Wolf. For that reason, the Court cannot assess, at this stage in the case, whether C-Suite was proposing a transaction in securities between Treehouse and Wolf, and thus whether C-Suite's performance under the Agreement rendered the contract unenforceable. *See* M.G.L. c. 110A, § 410(f). C-Suite's claims are not, accordingly, subject to dismissal on the basis that the Agreement is unenforceable under Massachusetts law due to C-Suite's failure to register as a broker-dealer.

## II.     Chapter 93A Claim.

The defendants next argue that Count V, which asserts a violation of M.G.L. c. 93A, fails because the conduct alleged amounts to nothing more than an ordinary breach of contract and does

not involve the level of unfair or deceptive behavior required for chapter 93A liability. Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2(a). To state a claim under M.G.L. c. 93A, § 11, a plaintiff must allege facts sufficient to establish "(1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by M.G.L. c. 93A, § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice." *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 469 Mass. 813, 820 (2014).

Although the statute does not define what constitutes an unfair or deceptive act or practice, Massachusetts courts have held that "an act or practice is unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive, or unscrupulous'; and 'causes substantial injury.'" *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)). An act or practice is deceptive "'if it possesses a tendency to deceive' and 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" *Id.* (quoting *Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 394 (2004)). "A successful [chapter] 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation, or that the defendant intended to deceive the plaintiff, or even knowledge on the part of the defendant that the representation was false." *Aspinall*, 442 Mass. at 394 (citing *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 703 (1975); *Swanson v. Bankers Life Co.*, 389 Mass. 345, 349 (1983)).

"[A] mere breach of contract, without more, does not amount to a violation of [chapter 93A]." *City of Beverly v. Bass River Golf Mgmt., Inc.*, 92 Mass. App. Ct. 595, 606 (2018). On the other hand, "[t]o be held unfair or deceptive under [chapter] 93A, practices involving even worldly-wise business people do not have to attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." *VMark Software, Inc. v. EMC Corp.*, 37 Mass. App. Ct. 610, 620 (1994). Thus, knowingly making a false representation can constitute an unfair trade practice, *see Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 779-80 (1986), as can conduct "in disregard of known contractual arrangements and intended to secure benefits for the breaching party," *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (1991) (quotation marks omitted).

The defendants contend that C-Suite's chapter 93A claim fails because, in substance, the conduct alleged amounts to nothing more than an ordinary breach of contract. The Court disagrees. C-Suite alleges that Treehouse and the individual defendants willingly accepted C-Suite's services under the Agreement and knew all along that C-Suite was performing services under the Agreement. ECF 1, ¶¶ 46, 87. But, C-Suite alleges, the defendants never intended to pay C-Suite for the work it performed to facilitate a Treehouse-Wolf transaction. *Id.* ¶¶ 86-87. C-Suite further claims that Treehouse "intended to use [C-Suite's] resources and expertise to [Treehouse's] own benefit without compensating" C-Suite. *Id.* ¶ 86. Drawing all factual inferences in favor of C-Suite, the defendants' alleged behavior "'possesses a tendency to deceive'" and "could reasonably be found to have caused [C-Suite] to act differently from the way [it] otherwise would have acted." *Walsh*, 821 F.3d at 160 (quoting *Aspinall*, 442 Mass. at 394); *accord Martorana v. Progressive Direct Ins. Co.*, No. 22-cv-10613-DJC, 2023 WL 2465639, at *7-8 (D. Mass. Mar. 10, 2023). The

alleged behavior likewise involves conduct "in disregard of known contractual arrangements and intended to secure benefits for the breaching party." *Anthony's Pier Four*, 411 Mass. at 474 (quotation marks omitted). Accordingly, C-Suite's complaint describes the type of unfair or deceptive behavior that can give rise to chapter 93A liability, and Treehouse's motion to dismiss the chapter 93A claim must be denied.

### III.     Equitable Claims.

The defendants next argue that Counts III and IV, which claim unjust enrichment and quantum meruit, respectively, must be dismissed because C-Suite's breach of contract and chapter 93A claims afford it an adequate remedy at law. "Unjust enrichment is the 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Columbia Plaza Assocs. v. Ne. Univ.*, 493 Mass. 570, 588-89 (2024) (quoting *Sacks v. Dissinger*, 488 Mass. 780, 789 (2021)). Quantum meruit "is an obligation that arises under quasi contract theory" and is awarded to avoid "unjust enrichment of one party and unjust detriment to the other party," which would "defeat . . . a person's reasonable expectations." *Liss v. Studeny*, 450 Mass. 473, 479-80 (2008) (quotation marks omitted). These equitable remedies "exis[t] to supplement those available at law and not to contradict the judgments embodied in the statutes and the common law." *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 82 (1st Cir. 2020) (quotation marks omitted).

Accordingly, parties that have an adequate remedy at law cannot claim either unjust enrichment or quantum meruit. *See Barnia v. Kaur*, 646 F. Supp. 3d 154, 168 (D. Mass. 2022). The First Circuit has held that the availability of a claim for unfair or deceptive practices under chapter 93A precludes a plaintiff from bringing a parallel claim for unjust enrichment that seeks to redress the same alleged injury. *See Schuster v. Wynn MA, LLC*, 118 F.4th 30, 38 (1st Cir. 2024) (affirming dismissal of the plaintiff's unjust enrichment claim because "Chapter 93A provides an

13

adequate legal remedy for similar unjust enrichment claims"); *Tomasella*, 962 F.3d at 84 (same). Here, C-Suite's unjust enrichment and quantum meruit claims seek to redress the same injury as its chapter 93A and breach of contract claims. Because the chapter 93A and breach of contract claims afford C-Suite adequate remedies at law, its equitable claims must be dismissed. *See Tomasella*, 962 F.3d at 82-83 (availability, not viability, of a remedy prohibits claim for unjust enrichment).

## CONCLUSION AND ORDER

For the foregoing reasons, the defendants' motion to dismiss, ECF 5, is GRANTED with respect to Counts III and IV of the complaint and DENIED with respect to Counts I, II, and V of the complaint.

SO ORDERED.

Dated: August 14, 2025

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE